UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/27/2022

LUC R. BERNARD,

                         Plaintiff,

        -v-

CARE DESIGN N.Y., CEO JIM MORAN,

                      Defendants.

------------------------------------------------------------------------X

20-cv-1527 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Luc R. Bernard ("Plaintiff" or "Bernard") brings this action, *pro se*, against Defendants Care Design New York ("CDNY") and Jim Moran ("Moran," and collectively with CDNY, "Defendants"). Bernard alleges, *inter alia*, that he was discriminated against on the basis of national origin, sex, race, and age, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Defendants move pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) to dismiss the complaint against them, arguing that: (1) Bernard has not served Moran; (2) Bernard has failed to exhaust his administrative remedies; (3) Bernard has not sufficiently alleged discrimination by CDNY; and (4) Bernard's additional allegations fail to state a claim. Dkt. No. 21. For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

      For the purposes of this motion, the Court accepts the allegations of the *pro se* plaintiff as true and "construes [them] broadly and liberally, interpreting them so as to raise the strongest arguments they suggest." *Genao v. City of N.Y.*, 2021 WL 2111817, at *2 (S.D.N.Y. May 25,

2021).  The Court also considers Bernard's factual allegations in his opposition brief "to the extent that they are consistent with the complaint, treating the new factual allegations as amending the original complaint."  *Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018); *see also Walker v. Schult*, 717 F.3d 119, 122 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) ("The solicitude afforded to *pro se* litigants . . . consists of liberal construction of pleadings [and] motion papers.").

CDNY is a Care Coordination Organization created in 2018 to provide care management services to meet the needs of children and adults with intellectual or developmental disabilities and their families.  Dkt. No. 2 at 9.[1]  Moran is its Chief Executive Officer ("CEO").  *Id*. at 2. Bernard worked for CDNY from July 1, 2018 until August 31, 2019.  *Id*. at 11, 20.  He is a white man who was born in Belgium in 1958 and was thus approximately 61 years old at the time of the alleged events in the complaint.  *Id*. at 4.

Bernard's complaint centers on two events: his failed promotion and his termination.[2]

## I.     Bernard's Failed Promotion

The first set of events relates to Plaintiff's failed promotion.  Prior to his employment at CDNY, Bernard had worked for an organization called AHRC NYC for 24 years.  *Id*. at 14.  He began his first five years as a Skill Development Trainer, was then promoted to a Medicaid Service Coordinator, and was then promoted again to a Senior Medicaid Service Coordinator, which was his role for two years before joining CDNY.  *Id*. at 14, 17.  As a Senior Medical

---

[1] All citations to Bernard's complaint, Dkt. No. 2, refer to the page numbers on the ECF filing and not the page numbers on the document itself.

[2] To the extent that Bernard attempts to raise a "second" failed promotion as a separate claim— the denial of the supervisor role when he transitioned to CDNY—he admits that it is outside the statute of limitations, Dkt. No. 2 at 19, and as a result, it was also not administratively exhausted.

Service Coordinator, Bernard supervised new Medicaid Service Coordinators and managed a full caseload. *Id.* According to Bernard, New York state law required that Medicaid Service Coordinators join a Care Coordination Organization and become care managers, which precipitated his employment with CDNY. *Id.* at 11.

On March 16, 2018, Bernard was initially offered the position of Senior Care Manager Supervisor with CDNY for a base yearly salary of $67,631.20. *Id.* at 17. Bernard alleges that Moran "stated that all life experiences would be taken into consideration." *Id.* at 14. On March 21, 2018, however, CDNY emailed Bernard that it had made a mistake in the job offer and that the proposed job was Care Manager, a lower role than that of Senior Care Manager Supervisor. On April 13, 2018, he was formally offered the Care Manager position at a yearly salary of $56,000. *Id.* Bernard asserts that although "this was a violation and a discrimination that [he] could take to the Equal Opportunity Employer [sic]," *id.* at 14, he nonetheless took the job, stating in his complaint that "I had no choice for I needed a job and I had no other choice with this agency and I had to take it. I had to swallow my pride and remain humble," *id.* He started the Care Manager position on July 1, 2018. *Id.* at 18.[3]

On January 14, 2019, Bernard applied for the position of Care Manager Supervisor. He was interviewed by Ana Quinones Brown, the Regional Director at CDNY. *Id.* at 14. He was asked if he had supervisory positions before and he mentioned that he had been a Second Lieutenant Reserve in the Belgian Armored Cavalry/NATO. *Id.* at 14–15. He and Brown also discussed difficult cases he had managed. *Id.* at 15. On February 15, 2019, Plaintiff was

---

[3] Bernard also states a range of alleged grievances with his hiring process, including the details of his background check—particularly with respect to their questions about the "Belgian School that [he] had attended," Dkt. No. 14, and the cost, terms, and subsequent changes in health insurance, *id.* These generalized grievances are factually and legally insufficient to constitute claims under any of the statutes Bernard invokes.

3

informed by his director, Anabel Batista, that while he was qualified for the Supervisor job and Batista had been very impressed with the way he handled difficult cases, she would not promote him to a Supervisor at that time.  *Id.*  Batista explained her concern that Bernard might be too strict with the families and Care Managers.  *Id.*  Brown also stated that she disliked that Bernard had reached above to "higher ups" when he had "had issues."  *Id.*  The particular instance in which Bernard reached to "higher ups" was when he had used his sick days, but his supervisor had told him that he had not in fact used a sick day, so Bernard contacted Human Resources—an issue that was eventually "resolved."  *Id.*

Instead, three women were selected for the supervisor role, none of whom had similar experience as Bernard or had ever worked in the role of a Senior Medicaid Service Coordinator.[4] Bernard labels this incident "[r]everse [r]acial [d]iscrimination," "[g]ender [d]iscrimination," and "[a]ge [d]iscrimination," stating that "[a]ll of the Supervisors in the Bronx office are women and friends" and "[t]here is not a single man in [the] post."  *Id.*

Bernard also alleges that one of his supervisors at CDNY, Karen Guarente, did not offer support to the three men on her six-person team, stating that she "used to brush us off and she did not pay attention to our issues at work.  She did not even say hello to us when she saw us."  *Id.* She celebrated the birthdays of women but not that of Bernard and would talk to women separately in their area.  *Id.*  She also had a Marilyn Monroe painting that stated "It is difficult to live in a man's world."  *Id.*  He alleges that "eventually [she] got rid of her three men. . . . transfer[ring] them to some other Supervisors, so that she could easily shuffle new cases onto

---

[4] Elsewhere in his complaint, Plaintiff states that five women were selected, *id.* at 18, none of whom had 25 years of experience or the experience Plaintiff had.  Based on the record, it appears that the "five women" is a typo.  *See* Dkt. No. 22 at 3 (opposition brief stating it was "three new female Supervisors promoted").

them through the new Supervisors." *Id*.  Guarente assigned 43 difficult cases to Bernard and his male colleagues even though CDNY had said it would try to keep caseloads at 35.  *Id*.  She also provided negative work evaluations for the men on her team—"even though [they] were no longer under her"—with which they disagreed.  *Id*.  The men filed complaints on the evaluations but "nothing was ever done about this issue."  *Id*.  Guarente also failed to keep copies of Bernard's training materials through the years.  *Id*. at 16.  In his opposition brief, he further alleges that the "Bronx Fordham Road" location "had only female supervisors,"  Dkt. No. 22 at 3, and that there "were only eight male Care Manager[s] in the office.  One retired, two were fired, two quit and the Plaintiff left an [sic] hostile environment."  *Id*. at 4.  Bernard alleges that he considers CDNY to be a "hostile environment" under current management.  Dkt. No. 2 at 16.

## II.    Bernard's Termination

The second set of events took place in August 2019 and ended with the termination of Bernard's employment.  On August 13, 2019, Bernard argued with his supervisor Jennifer Mild because another case had been added to his caseload, which "needed to have everything done to it" and increased his caseload to "41 persons . . . whe[n he] was only supposed to have 40."  *Id*. at 12.[5]  The prior day on August 12, he had informed Mild that the additional case would exacerbate his caseload.  *Id*. at 12.  He told her that he "felt uncomfortable with this case because the advocate had screamed with [him] on the phone and complained that she had registered with [CDNY] four and a half months ago."  *Id*.  Bernard describes that he had been yelled at "for about fifteen minutes."  Dkt. No. 22 at 1.  He states that "the fact that I had been yelled at by the advocate was never dealt with."  Dkt. No. 2 at 12.  Mild relayed his concerns to senior supervisor

---

[5] Bernard further states that his caseload had before this period been temporarily "raised to forty three from 2018 to early 2019."  Dkt. No. 22 at 3.

Guarente, but Guarente "would not budge on her decision." *Id*.  Bernard then scheduled a home

visit for an interview for the new case on the afternoon of August 13.  *Id*.

Bernard brought up his extra caseload again on August 13 to Mild.  *Id*.  Mild replied that

one of his cases was inactive, but Bernard pointed out that he was continuing to do work on that

case, even though he could not bill for it.  *Id*.  He later states in his opposition brief that the case

"had been inactive for months and [Mild] was supposed to reactivate the case."  Dkt. No. 22 at 2.

Mild then proceeded to ask him to "get a new consent form signed [by the family] and

uploaded," and it appears that doing so would have allowed him to no longer take on the

additional case.  Dkt. No. 2 at 12.  But when he returned from lunch, the inactive case had been

removed "from [his] . . . computer system," so Bernard then confronted Mild.  *Id*.

Bernard then "demanded to have [his] case back and informed [Mild] that [he] would not

take on the new case and would . . . instead get the consent form signed." *Id*.  Mild responded

that he had already scheduled an interview with the new case.  *Id*.  Bernard "raised [his] voice

and stated that [he] would not go and see the new case because [he] felt uncomfortable." *Id*.

Mild "rushed out of the room and went to the room of [Guarente] and [Bernard] entered with her

and firmly said that [he] will not go and see the new case . . . . because [he] felt uncomfortable."

*Id*. at 12.  Guarente then told Bernard that he was being aggressive, and he responded that he was

being "assertive." *Id*. at 12.  He states that he did not use foul language or make threats during

this discussion. *Id*. at 13, 18.  Bernard returned back to his desk, and Guarente and Mild came to

him and then told him that he was being "aggressive and angry" and that he should go home to

relax. *Id*. at 13.  After some back and forth on whether he was being aggressive, Bernard left

CDNY at approximately 3:30 p.m. that day.  *Id*.  Before leaving, he stated that he "would send

some emails out" "to the higher ups." *Id*. at 14, 18.  He states that he was "never taken to a private room . . . to discuss the issue" or "given . . . a verbal warning or a written warning." *Id*.

At approximately 6:00–6:30 p.m., Bernard decided to take the next day off and placed for "Paid Time Off" on his "Paycom." *Id*. at 13.  That same day, he received an email on his private email server from the Assistant Vice President of Human Resources at CDNY, Steven Morgenstern, asking him to call at his "earliest convenience." *Id*. at 18.  Bernard took the next day off and relaxed and "did not sen[d] any e-mails to the higher ups." *Id*. at 18.  On August 15, 2019, he was unable to log into his account and then was informed by a colleague that he had been suspended. *Id*. at 13.  He claims that he had not received "any verbal or written prior warnings." *Id*.  Although Mild claimed to have tried to reach Bernard, he states that he did not have any messages or calls from CDNY on his phone or cell phone from work. *Id*.  He tried to log back into his account on August 15, 2019 to no avail. *Id*.  He did not try to go back to work on August 16, 2019. *Id*. at 13.  He alleges that he was fired so quickly so that he could not relay his concerns to the compliance department at CDNY. *Id*. at 13–14.  He also asserts that he is an "employee in excellent standing who has always gone above and beyond." *Id*. at 16.

### III.    Post-Termination Events and the Equal Employment Opportunity Commission (EEOC) Determination

On August 19, 2019, Bernard "proceeded with [his] grievances to the [EEOC]." *Id*. at 19.  On that same day, he received a letter from Morgenstern, dated August 16, 2019, and sent by Federal Express, informing Bernard that he had been suspended effective August 14, 2019, and that Morgenstern had tried to contact him on his personal phone and email as well as on his work phone and email. *Id*.  Bernard claims that no messages were left on his work phone and that he could no longer access his work e-mail. *Id*.  The letter further stated that failure to contact Morgenstern would commence procedure for abandonment. *Id*.

Bernard returned to the EEOC the following day, August 20, 2019, and "the [EEOC] took [his] case for Race, Age, Sex and National Origin." *Id.* He told the EEOC that he was getting fired by the end of the month. *Id.* at 20. He also proposed to the EEOC that he would mail a copy of his grievance letter to the CEO. *Id.* at 19. He gave them a copy of Morgenstern's letter and was told that he should inform the EEOC if CDNY terminated his job. *Id.* On August 21, 2019, Morgenstern sent a second email to Bernard's personal email server stating that the email constituted Morgenstern's second attempt to reach Bernard and asking Bernard to call at his "earliest convenience." *Id.* Bernard states that he did not see the emails because he did not check his "personal emails for the longest time," he did not have internet access at home, and it was inappropriate to contact him on his private email about his job. *Id.*

On August 20, 2019, Bernard sent a five-page letter to Moran by certified mail that had previously been presented to the EEOC and that listed his grievances.[6] *Id.* at 19–20. Plaintiff also called Morgenstern at 10:00 p.m. that night but did not reach him and was not able to leave a voice message. He texted Morgenstern: "Steven Morgenstern, Your voicemail has not been set up yet, so i am texting you. I have nothing to say to you and do not call me back. I have sent an email explaining all to your CEO Jim Moran. Bye." *Id.* at 20. On August 27, Bernard claims that the letter to Moran "was received and signed by Nicole Martin" in Albany, New York. *Id.*

On September 4, 2019, Bernard received a letter by regular mail informing him that he was terminated from his job effective August 31, 2019. *Id.* The letter stated that on August 27, 2019, Bernard had been sent a letter indicating that his immediate response and cooperation into

---

[6] Bernard also states that he mailed a certified copy of his letter to Moran on August 25, 2019. Dkt. No. 2 at 19. While the exact date of the mailed letter is unclear in his timeline (or whether he sent two letters), the Court assumes for the purposes of the opinion that he sent it on the earlier date of August 20, 2019, in order to construe the facts in the light most favorable to Bernard.

the investigation of his suspension was required by August 30, 2019.  *Id*.  Bernard states that he

was unresponsive to Morgenstern's requests.  *Id*.  After subsequent back and forth with the

EEOC, *id*. at 20–22, the EEOC dismissed the charge and provided notice to Bernard of his right

to sue, Dkt. No. 21-2 at 2.  Bernard alleges that his retirement funds of "less than five thousand

dollars" were not mailed to him and were sent to a "Trust Fund" that is deducting maintenance

fees; that his "last travel expenses were never paid"; and that his "vacation, sick and personal

days were never paid."  Dkt. No. 22 at 4.

## PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint on February 19, 2020.  Dkt No. 2.  On

April 29, 2020, the Court entered an order of service directing the Clerk of Court to issue

summons to Defendants.  Dkt. No. 6.  On July 29, 2021, with service not having been effected,

the Court ordered Plaintiff to show cause why his case should not be dismissed for failure to

timely service process.  Dkt. No. 8.  Plaintiff showed cause to the satisfaction of the Court on

August 12, 2021, Dkt. Nos. 10, 11, and on August 23, 2021, the Court entered an order

extending the time for Plaintiff to effect service to October 22, 2021, Dkt. No. 12.

Defendants file the instant motion to dismiss on December 2, 2021, with a memorandum

of law in support.  Dkt. No. 21.  Plaintiff submitted a letter response to the motion which was

filed on the docket on December 15, 2021.  Dkt. No. 22.  On December 23, 2021, Defendants

filed their reply memorandum of law in further support of the motion to dismiss.  Dkt. No. 24.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [*i.e.,*] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

The Court construes *pro se* pleadings broadly and liberally, interpreting them so as to raise the strongest arguments they suggest.  *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000).  This obligation "is especially true when dealing with *pro se* complaints alleging civil rights violations."  *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 146 (2d Cir. 2002); *see also Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001) (same).  However, while the Court construes *pro se* pleadings liberally, this does not relieve *pro se* plaintiffs of the requirement that they plead enough facts to "nudg[e] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  Nor does it relieve them of the obligation to otherwise comply with the pleading standards set forth by the Federal Rules of Civil Procedure.  *See Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 687 (S.D.N.Y. 2007) ("[P]ro se status does not relieve a plaintiff of the pleading standards otherwise prescribed by the Federal Rules of Civil Procedure."); *see also Locicero v. O'Connell*, 419 F.

10

Supp. 2d 521, 525 (S.D.N.Y. 2006) (requiring that *pro se* litigants allege sufficient facts to indicate deprivation of a constitutional right).

## DISCUSSION

Although Plaintiff primarily describes the facts of his failed promotion and termination in his complaint, he asserts at the end of his complaint that he has been a "victim of defamation," a "victim of reverse discrimination, gender discrimination and age discrimination," that "[u]nfair labor practices took place," that he was "entrapped" and "deprived of the means to communicate with [CDNY] for [his] defense," and that he "consider[s] [CDNY] . . . [to be] a 'hostile environment' under current management." Dkt. No. 2 at 16. He claims that he is "now suffering emotional stress and disturbance" and seeks money damages.[7] *Id.* For the purposes of the following section, the Court liberally construes Bernard's complaint as raising claims for failure to promote, wrongful termination, and hostile work environment under Title VII, 42 U.S.C. § 1981, and the ADEA; defamation; entrapment; and claims for his benefits under New York Labor law.

Defendants move to dismiss the complaint on the grounds that Plaintiff has failed to exhaust his administrative remedies for claims premised on his discharge from CDNY and alleged hostile work environment, Dkt No. 21-1 at 5–7; that Plaintiff has not alleged an adverse employment action or an inference of discrimination sufficient to make out a claim of discrimination, *id.* at 7–11; and that Plaintiff's "stray references to other laws" fail to state a

---

[7] Plaintiff also lists the following for his rationale for money damages: "for giving a very expensive healthcare plan[,] for violating N.Y. labor laws[,] for not paying transportation ± $110 per month, for July 2019, August (1/2 month) 2019 and June 2019[,] for not paying ± a month worth of accrual[,] for destroying my reputation (25 years working with the disabled)[,] for making me work more than a year with an excessive case load over 40[,] for preventing me to access [sic] unemployment[,] for confronting me with the impossibility of having a good reference from Care Design N.Y." Dkt. No. 2 at 6.

claim.  They also argue that the claims against Moran must be dismissed for failure to complete service and for lack of personal jurisdiction.  *Id.* at 1 n.1.

## I.      Failure to Complete Service

Defendants, as an initial matter, argue that Plaintiff's claims against Moran are "subject to dismissal because Plaintiff has not completed or even attempted service on Mr. Moran."  Dkt. No. 21-1 at 1 n.1.  They argue that the failure of service means that the Court does not have personal jurisdiction over Moran.  *Id.*  Plaintiff does not address this point in his opposition brief, although he does claim that he sent his EEOC grievance to Moran.  Dkt. No. 2 at 20.

"Federal Rule of Civil Procedure Rule 12(b)(5) provides for dismissal of an action if service of process was not timely effected in accordance with Federal Rule of Civil Procedure 4(m)."  *George v. Pro. Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 442 (S.D.N.Y. 2016) (quotation omitted).  "When a defendant raises a Rule 12(b)(5) 'challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy.'"  *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (quoting *Preston v. New York*, 223 F. Supp. 2d 452, 466 (S.D.N.Y. 2002)).  "But, where a court has not conducted a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials."  *Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 173 (E.D.N.Y. 2015) (cleaned up).  The court must also "consider[ ] the parties' pleadings and affidavits in the light most favorable to the non-moving party."  *Pro. Disposables Int'l, Inc.*, 221 F. Supp. 3d at 442–43.

"Rule 4(m) provides that the district court shall, upon motion or on its own initiative after notice to the plaintiff, dismiss without prejudice any action in which service of the summons and complaint has not been made upon a defendant within 120 days after the filing of the complaint."  *Cioce v. Cnty. of Westchester*, 128 F. App'x 181, 183 (2d Cir. 2005).  Federal Rule of Civil

Procedure 4(e), which describes "Serving an Individual Within a Judicial District of the United

States," provides that

> [u]nless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by:
>
> (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
>
> (2) doing any of the following:
>
>> (A) delivering a copy of the summons and of the complaint to the individual personally;
>>
>> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>>
>> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e).  Under Rule 4(e)(1) Plaintiff could also serve process by following the

requirements of New York State law under New York Civil Practice Law & Rules (C.P.L.R.)

§ 308.  That section, in pertinent part, states that "[p]ersonal service upon a natural person shall

be made . . .

> 2. by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, such delivery and mailing to be effected within twenty days of each other; proof of such service shall be filed with the clerk of the court designated in the summons within twenty days of either such delivery or mailing, whichever is effected later; service shall be complete ten days after such filing; proof of service shall identify such person of suitable age and discretion and state the date, time and place of service."

N.Y. C.P.L.R. § 308(2) (McKinney).

Plaintiff has not met his burden that he served Moran under the procedures outlined in Federal Rule of Civil Procedure 4(e).  Plaintiff does not indicate that he served the summons and complaint in the instant action (as opposed to the EEOC charge) to Moran, his place of abode or dwelling, or a designated agent of Moran.  The sole affidavit filed by Plaintiff provides that he served Tammy Willoughby, a general agent of CDNY.  Dkt. No. 13.  However, the affidavit does not state that Willoughby is an agent of Moran.  *Id.*  Nor is there any indication that Plaintiff delivered a summons addressed to Moran that meets the requirements of New York C.P.L.R. § 308(2).  Service to the corporation at which an individual is employed is not service "to the person" under Section 308(2).  *Urena v. 0325 Tuta Corp.*, 2022 WL 4284879, at *3 (S.D.N.Y. Sept. 16, 2022).  Therefore, the Court dismisses the claims against Moran without prejudice pursuant to Rule 4(m).

## II.      Failure to Exhaust Administrative Remedies

Defendants argue that Plaintiff's federal claims for "wrongful discharge" and "hostile work environment" have not been administratively exhausted and must be dismissed.  Dkt. No. 21-1 at 5.  They argue that the "EEOC Charge focused exclusively on his failed promotion application."  *Id.*  In addition, they argue that the wrongful discharge and hostile work environment are not reasonably related to the EEOC charge.  *Id.*

To bring a civil action under Title VII or the ADEA, a plaintiff must first file a charge with the EEOC or an equivalent state agency within the time periods provided by law.  *See* 29 U.S.C. § 626(d); *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5)(establishing similar time limit for ADEA claims); *see also Gindi v. N.Y.C. Dep't of Educ.*, 786 F. App'x 280, 282 (2d Cir. 2019) (same); *Bamba v. Fenton*, 758 F. App'x 8, 10 (2d Cir. 2018) (same).  The rule serves the important purpose of "encourag[ing] settlement of

discrimination disputes through conciliation and voluntary compliance," which "would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." *Miller v. Int'l Tel. and Tel. Corp.*, 755 F.2d 20, 26 (2d Cir. 1985). Accordingly, a claim that is not presented to the EEOC generally must be dismissed. *See*, *e.g.*, *Madray v. Long Island Univ.*, 2012 WL 2923500, at *11 (E.D.N.Y. July 16, 2012); *Chinn v. City Univ. of N.Y. Sch. Of Law at Queens Coll.*, 963 F. Supp. 218, 223 (E.D.N.Y. 1997) (same).

However, "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam)). The Second Circuit "ha[s] recognized three kinds of situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action": (1) "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"; (2) where the plaintiff "alleg[es] retaliation by an employer against an employee for filing an EEOC charge"; and (3) "where plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts v. City of N.Y. Dep't of Hous.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993) (internal quotation marks and citation omitted), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102–166; *see also Zagaja v. Vill. of Freeport*, 2015 WL 3507353, at *14 (E.D.N.Y. June 3, 2015) (Bianco, J.). To determine whether the first exception applies, "the focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Williams*, 458 F.3d at 70 (quoting

*Deravin v. Kerik,* 335 F.3d 195, 201 (2d Cir. 2003) (internal quotation marks omitted)).  "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'"  *Id.* (quoting *Deravin*, 335 F.3d at 202).  "The failure to include a charge of retaliation based on the filing of an EEOC charge is excused when the act of retaliation follows the filing of the EEOC charge.  The logic for relaxing exhaustion requirement in that circumstance is the 'close connection of the retaliatory act to both the initial discriminatory conduct and to the filing of the charge itself.'"  *Bernstein v. N.Y.C. Dep't of Educ.*, 2020 WL 6564809, at *10 (S.D.N.Y. Nov. 9, 2020) (quoting *Butts*, 990 F.2d at 1402).

The Court finds that Plaintiff did not raise charges related to a hostile work environment or his alleged discriminatory termination in his EEOC complaint.  Plaintiff's EEOC Charge of Discrimination is signed and date-stamped as received on August 20, 2019.  It alleges "discrimination based on sex (male), national origin (Belgian), race (white) and age (61)."  Dkt No. 21-2 at 90.[8]  Plaintiff alleges that he "applied for and was qualified for the position [of Care Manager Supervisor]" and "on February 15, 2019, was denied the position . . . .  due to [his] race, national origin, sex and age."  *Id.*  In particular, he alleges that he applied for and was qualified for the position of Care Manager Supervisor because he had "many years of supervisory experience and met all of [Defendant's] qualifications due to [his] 24 years of

---

[8] Defendants submit the full EEOC file with their motion to dismiss, including Defendants' response to the EEOC charge.  On this motion, the Court considers only Plaintiff's EEOC charge under Federal Rule of Evidence 201 solely as to "whether adequate notice was provided to the EEOC of the conduct alleged to be discriminatory or to show what date the claim was signed, but not for the truth of the assertions therein."  *Bamba v. U.S. Dep't of Homeland Sec.-FPS*, 2021 WL 4478677, at *6 (S.D.N.Y. Sept. 30, 2021); *see also Jeanty v. Newburgh Beacon Bus Corp.*, 2018 WL 6047832, at *4 (S.D.N.Y. Nov. 19, 2018) (courts may take judicial notice of documents in public record but not to establish truth of the matters asserted therein.); *Lang v. N.Y.C. Health & Hosps. Corp.*, 2013 WL 4774751, at *2 (S.D.N.Y. Sept. 5, 2013) (taking judicial notice of plaintiff's EEOC complaint but considering it only for whether plaintiff raised his discrimination claim in that complaint).

experience in the disability field," and that instead of him, "[t]hree women," "all substantially younger . . . and less qualified," were chosen.  *Id.*  The charge thus is addressed to Plaintiff's claim of failure to promote.  It makes no mention of his termination or of a hostile work environment.  Unless those claims are reasonably related to Plaintiff's charge of failed promotion,[9] Plaintiff did not administratively exhaust either of them.

Plaintiff's claim of a hostile work environment is not reasonably related to his charge of failure to promote.  The claims of a hostile work environment do not involve conduct that could reasonably be expected to grow out of the charge regarding the failure to promote.  The claim of failure to promote involves a discrete set of facts involving a limited number of persons and occurring in a limited time period—in or around February 15, 2019.  Dkt No. 21-2 at 90 (EEOC Charge specifying the date of February 15, 2019); *see also* Dkt. No. 2 at 14–15 (Plaintiff's complaint).  The hostile work environment claim, by definition, would involve conduct that is "severe or pervasive," *Ball v. Marriott Int'l, Inc.*, 2022 WL 4133207, at *13 (S.D.N.Y. Sept. 12, 2022) (quoting *Sciano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006)), and while there is "no fixed number of incidents that a plaintiff must endure in order to establish a hostile

---

[9] Although neither party briefs the issue of whether there was a viable retaliation claim based on CDNY's suspension of Plaintiff, any such retaliation claim was not raised in the charge and is not reasonably related to the EEOC charge because Plaintiff did not allege any protected activity in his EEOC charge.  *See Jenkins v. N.Y. City Transit Auth.*, 646 F. Supp. 2d 464, 472 (citing cases); *Cordoba v. Beau Deitl & Assocs.*, 2003 WL 22927874, at *10 (S.D.N.Y. Dec. 2, 2003) (holding that failure to allege protected activity in EEOC complaint and reliance on sole allegation that defendant "committed unlawful discriminatory practices and retaliation against me based upon my age and national origin" was fatal to unexhausted retaliation claim); *Bailey v. Colgate-Palmolive Co.*, 2003 WL 21108325, at *13 (S.D.N.Y. May 14, 2003) (holding that retaliation claim was not reasonably related where EEOC complaint did not refer to any retaliatory conduct or protected activity).  Similarly here, "nothing in the Charge provided the EEOC adequate notice to investigate possible retaliation." *Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 650 (2d Cir. 2011).  Plaintiff's retaliation claim thus is barred by his failure to raise it with the EEOC.

work environment," Plaintiff's lone allegation of a failed promotion—in isolation—falls well below both thresholds of severity and pervasiveness, *see Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002) (listing cases in which hostile work environment claims "have been dismissed for insufficiency of evidence even though . . . they involved . . . a similar or greater number of incidents"); *Pierre v. Napolitano*, 958 F. Supp. 2d 461, 487 (S.D.N.Y. 2013) (finding that a single instance of being passed over for promotion does not show severe enough conduct). Additionally, Plaintiff's allegations in his complaint state that the promotion decision involved two persons—Batista, the director, and Brown, the regional director—who were uninvolved Plaintiff's hostile work environment allegation.  Dkt. No. 2 at 14–16.  The hostile work allegation instead names Mild, his supervisor, and mostly Guarente, his regional supervisor, as the main offenders.  *Id*. at 12, 15.  And Plaintiff, having filed the charge after he did not go back to work, has obviously not alleged that his hostile work environment arose as a result of his filing of the EEOC charge.  He also has not alleged that a hostile work environment was carried out in precisely the same manner as alleged in the EEOC charge.

  For similar reasons, Plaintiff's termination is also not reasonably related to his failure to promote claim.  According to his complaint and the EEOC charge, Plaintiff's termination took place six months after his failed promotion.  His termination also did not involve conduct or persons that took place in the same manner as the failure to promote.  Again, plaintiff's promotion decision involved Batista and Brown, who were uninvolved in his termination.  *Id*. at 14–16.  The termination, in contrast, appears to primarily involve Mild, Guarente, and Morgenstern, the Human Resources representative.  *Id*. at 12–13, 18–20.  Plaintiff also alleges that the termination arose from a specific incident involving Mild and Guarente and resulted from his stated intention to call "higher ups."  *Id*. at 14, 18.  Therefore, Plaintiff's termination

does not fall within the scope of an EEOC investigation regarding his failure to promote.  Nor, for these reasons, was the termination carried out in the same manner as the alleged EEOC charge.

Finally, Plaintiff's termination also did not occur as retaliation for his filing of his EEOC charge.  Although Plaintiff had let Moran know that he was filing a grievance prior to CDNY's letter indicating his termination, and the dates of notice regarding Plaintiff's EEOC charge to CDNY and Plaintiff's termination overlap, *see* Dkt. No. 2 at 19–20 (describing how he sent his grievances to Moran on August 20, 2019 and that it was received on August 27, 2019); Dkt. No. 2 at 20 (dating his termination as August 31, 2019); Dkt. No. 21-2 at 86 (the "Notice of Charge of Discrimination" to CDNY dated August 31, 2019), Plaintiff does not allege that the proximity is anything other than a coincidence.  Plaintiff's own allegations show that the termination resulted from events preceding his filing of grievances with the EEOC.  CDNY suspended Plaintiff following an incident on August 13, 2019.  Plaintiff then states that he initially received a letter dated August 16, 2019 indicating that he was suspended and that "failure to contact . . . Morgenstern . . . would commence procedure for job abandonment."  Dkt. No. 19; *see also* Dkt. No. 21-2 at 72 (August 16, 2019 letter stating that "Failure to contact Human Resources will result in job abandonment and termination of your employment procedures will commence.").  This all occurred *before* Plaintiff met with the EEOC on August 19, 2019.[10]  Plaintiff also confirms that he received emails from Morgenstern dated August 13, 2019, and August 21, 2019, all attempting to follow up, although Plaintiff claims that he does not access his private email

---

[10] Defendants also proffer an additional letter sent to Plaintiff dated August 20, 2019 following up on the initial letter sent on August 16, 2019, stating that Plaintiff should contact Morgenstern "by Monday, August 26, 2019."  Dkt. No. 21-2 at 75.  This letter is immaterial to the Court's conclusions.  Because it was not referenced by Plaintiff in his complaint, the Court does not consider it.

regularly.  Dkt. No. 2 at 18–19.  On August 25, 2019, Plaintiff texted Morgenstern that he has

"nothing to say to [him] and do not call [him] back" and that he "has sent an email explaining all

to your CEO Jim Moran."  *Id.* at 19–20.  This all occurred before Moran had notice of Plaintiff's

EEOC grievances on August 27, 2019.  Plaintiff also mentions that he received another letter

dated August 27, 2019 and a termination letter dated September 4, 2019 that ascribed Plaintiff's

termination to his failure to respond to the letter dated August 27, 2019.  *Id.* at 20; *see also* Dkt.

No. 21-2 at 79 (August 27 letter), 80 (letter providing official notice of termination).  Thus, on

the present pleadings—and even recognizing the solicitude Plaintiff must be afforded as a *pro se*

litigant—the Court finds that Plaintiff's termination was not in retaliation for Plaintiff's filing of

his EEOC charge.  The claims of hostile work environment and unlawful termination thus do not

relate to Plaintiff's EEOC charge and therefore must be dismissed because of Plaintiff's failure

to exhaust his administrative remedies.

Plaintiff's hostile work environment and wrongful termination claims cannot be cured

with proper administrative exhaustion because it is now past the statute of limitations, with his

termination occurring in 2019.  The Court thus dismisses these claims with prejudice.

## III.    Unlawful Discrimination

Defendants also argue that Plaintiff has not alleged unlawful discrimination on the basis

of any protected characteristic.  Dkt. No. 21-1 at 12–16.  They argue that Plaintiff has not alleged

facts from which the Court could infer either that Defendants took an adverse employment action

or that would support an inference of discrimination.  *Id.*

To establish a prima facie case of discrimination for Title VII, the ADEA, and 42 U.S.C.

§ 1981, a plaintiff must show "(1) that she is a member of a protected class, (2) that she was

qualified for the position she sought, (3) that she suffered an adverse employment action, and (4)

can sustain a minimal burden of showing facts suggesting an inference of discriminatory

motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Doe v. Columbia Univ.*, 831 F.3d 46, 56 & n.9 (2d Cir. 2016) (describing the application of Title VII's *McDonnell Douglas* burden-shifting framework to the ADEA, "with the distinction that an ADEA plaintiff must demonstrate that age was a but-for, and not merely a motivating, factor"); *McGill v. Univ. of Rochester*, 600 F. App'x. 789, 790 (2d Cir. 2015) ("We analyze Title VII, Section 1981, . . . discrimination claims under the same burden shifting framework as first set forth by the Supreme Court in *McDonnell Douglas*."). Under the ADEA and Section 1981, the plaintiff must also prove that discrimination was a "but for" cause of the adverse action. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (Section 1981); *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009) (ADEA).

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007). Examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *see also Kassner*, 496 F.3d at 238 (same). "[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results as such as decrease in pay or being placed on probation." *Davis v. Goodwill Indus. of Greater N.Y. & N.J., Inc.*, 2017 WL 1194686, at *7 (S.D.N.Y. March 30, 2017) (quoting *Honey v. Cty. of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002)).

Application of the *Iqbal*/*Twombly* pleading standards require that "[t]he facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 311.  In other words, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id*. "To the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal*." *Id*. at 310 (emphasis in original).  An inference of discrimination can "arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Id*. at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded by statute on other grounds*, Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85).

Defendants do not dispute Plaintiff's assertion that he is a member of protected groups under the first element.  Nor do they dispute that he was qualified both for his current position as well as the Supervisor role.  Defendants, however, dispute whether his "termination" was an adverse employment action and whether he pleaded facts sufficient to meet his minimal burden of showing an inference of discrimination.

## A.      Adverse Employment Actions

The Court begins with Defendants' first contention.  Plaintiff alleges two adverse employment actions: (1) the failure to promote him and (2) his termination.[11]  Defendants urge that based on Plaintiff's allegations, the latter did not constitute an adverse employment action. While it is undisputed that a "termination of employment" is an adverse employment action, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (emphasis in original) (citation omitted), Defendants assert that Plaintiff either quit or abandoned his position, Dkt. No. 21-1 at 9.  The facts construed liberally in favor of the *pro se* Plaintiff, however, support the conclusion that CDNY terminated Plaintiff.  Defendants sent Plaintiff a letter with "official notice of the termination of [his] employment" with the asserted basis for that decision as that Plaintiff was "unresponsive to [their] requests."  Dkt. No. 21-2 at 81.  But that letter alone is not dispositive of the legal outcome.  When the facts are construed in the light most favorable to Plaintiff, he had responded to Defendants by sending his grievances to Moran.[12]  After his dispute with Mild and Guarente, he had returned to the job site and registered a day off after the incident, but his accounts were closed.  Dkt. No. 2 at 18.  Defendants claim they called him, but Plaintiff argues that many of those calls did not occur, and otherwise claims to find it inappropriate to discuss

---

[11] As this opinion has previously noted, Plaintiff has no claim for his termination under Title VII and the ADEA independently due to his failure to exhaust that claim in a timely manner.
[12] *Kearse v. ATC Healthcare Servs.*, 2014 WL 958738 (S.D.N.Y. Mar. 11, 2014), upon which Defendants rely, is distinguishable.  In that case, the plaintiff notified the defendant that he was "ready to turn in my parking permit and my key," and then subsequently surrendered his parking permit and left in the middle of the day."  *Id.* at *6.  *Barnes v. CCH Corp. Sys.*, 2004 WL 1516791 (S.D.N.Y. July 7, 2004) is also distinguishable because there the plaintiff left work and did not return.  *Id.* at *2.  Under those circumstances, the court—on summary judgment—concluded that the plaintiff quit "by refusing to continue at his job and leaving his employment."  *Id.* at *5.  In neither case was there evidence that the plaintiff received a termination letter.  Here, Plaintiff attempted to return to his job and but was barred from accessing his job resources and received a termination letter from CDNY.

work issues over his private email.  *Id*. at 13.  Plaintiff also had not yet returned any of the

CDNY equipment that was issued to him as of the time of his official termination.  Dkt. 21-2 at

81.  His conversations with the EEOC also evinced that he did not believe that he had abandoned

the job or quit.  *See* Dkt. No. at 19 (recalling that he was "told to inform [t]he E.E.O.C. in the

eventuality that Care Design was to terminate [his] job").  The allegations, when construed in the

light most favorable to Plaintiff, show that Plaintiff had not yet quit or abandoned his job by the

time of the September 4 letter.

### B.    Discrimination Based on Protected Classes

The Court now considers whether Plaintiff's allegations give rise to an inference of

discrimination based on the four grounds identified in Plaintiff's complaint.  For the following

reasons, the Court finds that only Plaintiff's claim for failure to promote on the basis of his

gender survives.  The Court independently dismisses the remainder of the claims with prejudice

insofar as they rely on national origin, race, or age as the alleged grounds of discrimination.

### 1.    National Origin

First, the Court concludes that Plaintiff's allegations do not create an inference of

discrimination based on national origin for both adverse employment actions.  Nowhere in the

complaint does Plaintiff allege that his termination or failed promotion was due to his Belgian

nationality.  With respect to his promotion, Plaintiff recalls mentioning in his interview that he

had served in the Belgian Armored Cavalry.  Dkt. No. 2 at 14.  But none of his allegations

indicate that he was denied the promotion because of his Belgian nationality.  Instead, he alleged

that they told him he was denied because he "might be too strict with the families and the Care

Managers" and his management disputes, namely his "reach[ing] above[] to the higher ups when

[he] had issues."  Dkt. No. 2 at 15.  Neither of those remarks relate to his Belgian nationality, let

alone disparage him for his Belgian background, and thus fail the *de minimis* standard.  He also

24

does not discuss the national origin of the promoted women.  There is also no mention of his

nationality in his description of the events leading to his termination.  Because even the

complaint "liberally read" does not suggest "a claim that []he has inadequately or inartfully

pleaded and that []he should therefore be given a chance to reframe," *Cuoco v. Moritsugu*, 222

F.3d 99, 112 (2d Cir. 2000), the Court thus dismisses the Title VII claims based on national

origin with prejudice.

### 2.      Race

Second, the Court concludes that Plaintiff's allegations do not create an inference of

discrimination based on race for both alleged adverse employment actions.  Nowhere is

Plaintiff's race mentioned in any of his allegations concerning his failed promotion or his

termination.  He also does not discuss the race of the promoted women.  Plaintiff does not meet

the "minimal burden of showing facts suggesting an inference of discriminatory motivation."

*Littlejohn*, 795 F.3d at 311.  Therefore, the Court dismisses the Section 1981 claims and Title VII

claims regarding race discrimination with prejudice.

### 3.      Age

Third, the Court concludes that Plaintiff's allegations do not create an inference of

discrimination based on age with respect to his termination.  Plaintiff does not allege any

comments, actions, or anything related to the sequence of events from the addition of the

additional case to his workload, to the dispute with Mild and Guarente, to his eventual

termination, that could be construed as based on his age.

In addition, the Court concludes that Plaintiff fails to allege that his failed promotion was

due to discrimination based on his age.  Plaintiff's primary allegation is that he had twenty-four

years of experience at the time of the promotion and that it was discriminatory for CDNY to

promote younger persons than him.  But in contrast to Title VII, Plaintiff was required to "assert

that his age is the 'but-for' cause of the alleged adverse employment action." *Ninying v. N.Y.C. Fire Dep't*, 807 F. App'x 112, 114 (2d Cir. 2020) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).  Plaintiff did not meet this standard either through direct or circumstantial evidence.  He does not allege that the proffered reasons for his failed promotion were pretext for age, and nor could the proffered reasons—his "strictness" and his reaching out to higher-ups—be reasonably read as discrimination based on age.  The observation that the other promoted applicants were younger, alone, is insufficient.  *See James v. Borough of Manhattan Cmty. Coll.*, 2021 WL 5567848, at *7 (S.D.N.Y. Nov. 29, 2021) ("Conclusory allegations of age discrimination and citation that some of those who were granted the contract were younger than her, without further evidence, cannot sustain the required minimal inference of discriminatory motivation for the adverse employment action.").  Further, treating age as a but-for cause of his termination would sit in tension with his allegation that he was denied his promotion based upon his gender.  Plaintiff alleges that men were generally treated poorly at CDNY and his allegations do not distinguish that treatment based on age.  *See*, *e.g.*, Dkt. No. 22 at 4.  Thus, as pleaded, his complaint does not state that discrimination based on age was *necessary* for his termination, which is fundamental for "but for" causation.  Again, because even a liberal reading of the complaint does not suggest a claim that was merely "inadequately or inartfully pleaded," *Cuoco*, 222 F.3d at 112, the Court dismisses the ADEA claims with prejudice.

### 4.    Gender

Fourth, the Court concludes that Plaintiff's allegations do not create an inference of discrimination based on gender with respect to his termination.  Again, nowhere does Plaintiff mention any comments by the actors, actions by CDNY or its employees, or anything related to the sequence of events that could be construed as based on his gender.  From his own version of the events, his so-called "mistake" was informing his supervisors that he would "would send

some emails out" "to the higher ups." *Id.* at 14, 18.  The ensuing and preceding events had nothing to do with the fact that he is male.  The Court independently dismisses this claim with prejudice on this ground.

Defendants, however, are incorrect that Plaintiff fails to allege that his failed promotion was the result of his gender.  Plaintiff has alleged the following facts: that all of the promoted persons were women, Dkt. No. 22 at 3; that men working under Guarente were given poor performance reviews, more difficult cases, and less support generally, Dkt. No. 2 at 15; that there was a general pattern of men quitting or being fired, Dkt. No. 22 at 4 ("[T]here were only eight male Care Manager[s] in the Office. One retired, two were fired, two quit and the Plaintiff left an [sic] hostile work environment."); and that there is not a single male supervisor at the Bronx location, *id*. at 3 ("[T]he Bronx Fordham Road had only female Supervisors."); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ("A showing that similarly situated employees belonging to a different [protected class] received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for . . .  discrimination."); *see, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir. 2010) ("[T]he fact that other younger employees were not disciplined for violating numerous policies is both prima facie evidence of discrimination (*i.e.*, it suggests that [Plaintiff] may have been treated differently from similarly situated coworkers), and evidence that the reasons given by [Defendant] for firing [Plaintiff] were pretextual.").

Defendants also have not challenged that Plaintiff was qualified for the promotion; Plaintiff's characterization of his qualifications relative to the other promoted candidates; or whether Plaintiff is "similarly situated" to the promoted women.  Plaintiff has adequately plead

that the promoted women are "similarly situated in all material respects," *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997), which for a failure-to-promote claim requires "comparing the qualifications of the plaintiff with those of the person promoted," *Martinez v. Davis Polk & Wardwell LLP*, 208 F. Supp. 3d 480, 487 (E.D.N.Y. 2016), *aff'd*, 713 F. App'x 53 (2d Cir. 2017).[13]   Plaintiff has described himself as "an employee in excellent standing," Dkt. No. 2 at 16, that he "had been longer in the disability field than Director . . . Batista and Senior Supervisor . . . Guar[e]nte," Dkt. No. 22 at 3, and most importantly, that he "had been around way longer than the three new Supervisors promoted," *id*. at 3–4.  He also notes that none of the promoted Supervisors had ever been "Senior Medicaid Service Coordinators."  Dkt. No. 2 at 15. As for a prima facie case of comparability, the promoted women and Bernard are comparable because they were all "Care Managers"—the same role as Plaintiff at the time they were all considered for promotion.  Dkt. No. 2 at 15; *see also Terry v. Ashcroft*, 336 F.3d 128, 139 (2003) ("[T]he circumstances under which [the plaintiff] was not selected give rise to an inference of discrimination on the basis of race because his application is marked with his race and the position was offered to an allegedly significantly less qualified African–American man.").

Liberally construed and taking the facts of the pleading to be true—which the Court must do at this stage—the complaint plausibly alleges a Title VII failure-to-promote claim based on gender discrimination.  The allegations show the "minimal" inference of discrimination in order

---

[13] At least one court in our District has concluded that "discrimination claims based on a failure to promote, which, unlike a claim based on discrimination, requires a *stronger* showing of similarity before jobs may be found to be comparable."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 479 (S.D.N.Y. 2011) (emphasis added).  The Court needs not determine if the similarity standards are more stringent for failure-to-promote claims because the Court finds that Plaintiff's allegations would also meet this "stronger showing."  *Id.*

to succeed at the first stage of the *McDonnell Douglas* burden shifting framework on a motion to

dismiss. *Littlejohn*, 795 F.3d at 311.

## IV.   Other Claims

### A.   Defamation

Plaintiff also claims that Brown's statement, following his failed promotion, that he

"might be too strict with the families and the Care Managers" is "Defamation of Character."

Dkt. No. 2 at 15.  Plaintiff specifically describes these statements as having occurred over a

phone call while he was riding a bus.  Because the statements were spoken, the Court analyzes

the alleged defamatory statement as a slander claim.  In New York, a cause of action for slander

is: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and

concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker,

(vi) either causing special harm or constituting slander *per se*, and (vii) not protected by

privilege." *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001).

Plaintiff fails to allege several elements of a defamation claim.  First, he fails to allege

that this statement was published to a "third party," given that the statement occurred in a phone

call with Plaintiff.  Second, the statement is likely an unactionable opinion because it "ha[s] no

precise meaning, [is] not capable of being objectively characterized as true or false, and [is]

merely a general reflection of the speaker's viewpoint." *Wait v. Beck's N. Am., Inc.*, 241 F.

Supp. 2d 172, 183 (N.D.N.Y. 2003) (collecting cases); *see also Loksen*, 239 F.3d at 268

("Statements . . . that a co-employee's work is dangerous and his employment should therefore

be terminated, if articulated as an evaluation of his performance, would likely be protected as a

statement of opinion.").  Third, the statement is not defamatory as strictness at work does not

"expose[] an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule,

aversion, ostracism, degradation, or disgrace . . . and . . . deprive[] one of . . . confidence and

friendly intercourse in society.'" *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *Kimmerle v. N.Y. Evening J.*, 262 N.Y. 99, 102 (N.Y. 1933)).  The Court thus dismisses the defamation claim with prejudice.

> **B.      Entrapment**

Plaintiff also claims that there was "[e]ntrapment" based on the fact that he did not receive calls on his home phone or cell phone from CDNY, even though CDNY claims that they tried to call him.  Dkt. 2 at 13.  "[E]ntrapment is a defense that can be raised in a criminal proceeding.  It is not an independent civil cause of action." *Cantrell v. Igie*, 2016 WL 7168220, at *8 (S.D.N.Y. Dec. 8, 2016) (citing *DiBlasio v. City of N.Y.*, 102 F.3d 654, 656–57 (2d Cir. 1996)).  The Court thus dismisses the "entrapment" claim with prejudice.

> **C.      Hostile Work Environment**

Plaintiff also argues that he encountered a hostile work environment at CDNY based on his gender.  A hostile work environment under the ADEA and Title VII is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment." *Kassner*, 496 F.3d at 240 (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)) (internal quotation marks omitted).  A plaintiff must allege that the conduct "(1) was objectively severe or pervasive in that it created an environment that a reasonable person would find hostile or abusive; (2) created an environment that the plaintiff subjectively perceived as hostile or abusive; and (3) occurred because of the plaintiff's protected characteristic." *Sherman v. Fivesky, LLC*, 2020 WL 2136227, at *5 (S.D.N.Y. May 5, 2020).  "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation and internal quotation

marks omitted).  Objective severity "can be determined only by looking at all of the circumstances [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  The Second Circuit has "cautioned against setting the bar too high" in the context of a motion to dismiss a claim of hostile workplace, and a plaintiff is therefore not required to recount an exhaustive list of specific acts that contributed to a hostile workplace.  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Terry*, 336 F.3d at 148).  However, minor incidents alone do not give rise to a finding of hostile work environment.

Importantly, a hostile work environment "is [not] something that exists in some absolute way, like poisonous chemicals in the air, affecting everyone who comes in contact with it." *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010) (Lynch, J., sitting by designation).  A plaintiff must demonstrate that *he* was the target of the hostile work environment and was subjected to hostility *because of* membership in a protected class.  *See Kassner*, 496 F.3d at 241.  A hostile work environment is "not one that is bad for all living things in a manner that happens to involve [characteristics of the protected class]; rather it is one that is *discriminatorily* hostile to an employee based on *his or her* [membership in the protected class]." *Krasner*, 680 F. Supp. 2d at 514.

For reasons previously mentioned, the Court has already independently dismissed this claim due to failure of exhaustion.  But even if the claim were timely exhausted, Plaintiff has not sufficiently alleged a hostile work environment claim.  A court considering a hostile work environment claim must look "at all of the circumstances."  *Harris*, 510 U.S. at 23; *see Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (same); *Alfano*, 294 F.3d at 378

(stating that "facially neutral incidents" included the "totality of the circumstances"); *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998) (finding that district court erred in basing summary judgment "solely on four reported instances of harassment, instead of on the totality of the circumstances"). A hostile work environment can be comprised of hostile or abusive acts that have "overtones" based on the protected characteristic as well as those that are "neutral" on their face. *Alfano*, 294 F.3d at 377–78. "Facially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim," but there must be some evidence that they are motivated by a "discriminatory animus" or that the "neutral" incidents "were in fact discriminatory." *Id.* at 377–78. In the absence of such evidence, a plaintiff is left just with evidence of a workplace characterized as being "harsh, unjust, and rude"—not enough to support a claim of a hostile work environment based on the protected characteristic. *Id.* at 377. There is no fixed number of incidents that are overtly discriminatory that is necessary to make out a claim of a hostile work environment, but there must be enough for the factfinder to conclude that the workplace is "permeated with discriminatory intimidation, ridicule, and insult." *Brennan*, 192 F.3d at 318 (quoting *Harris*, 510 U.S. at 21).

Plaintiff has not alleged sufficient incidents to give rise to the conclusion that the work environment he experienced was objectively hostile or abusive based on his gender. Most of Plaintiff's allegations are facially neutral—namely, that all of the promoted persons were women, Dkt. No. 22 at 3; that men working under Guarente were given poor performance reviews, more difficult cases, and less support, and were transferred, Dkt. No. 2 at 15–16, a general cold shoulder in interactions with male employees, *id.*; that there was a general pattern of men quitting or being fired, Dkt. No. 22 at 4; and that there is not a single male supervisor at the

Bronx location, *id.* at 3.  *See*, *e.g.*, *Chacko v. Connecticut*, 2010 WL 1330861, at \*10 (D. Conn. Mar. 30, 2010) (finding that allegations that white physicians were favored over Asian physicians in scheduling, general resources, evaluations, and instances of hostility were facially neutral).  There may be allegations that some or all of that conduct was motivated by Plaintiff's gender.  As noted above, Plaintiff has alleged sufficient facts to give rise to an inference that the failure to promote him was based on his gender.  The fact that there exists circumstantial evidence that the failure to promote Plaintiff was based on his gender, however, is not sufficient to support the claim that, as an objective matter, he was subjected to "discriminatory intimidation, ridicule, and insult" on a "pervasive" or "severe" basis such that he would have a Title VII claim for hostile work environment.  All that Plaintiff has marshalled in support of the claim that this was more than facially neutral discrimination was Guarente's Marilyn Monroe poster.  But the gender-based message of that poster—that "[i]t is difficult to live in a man's world"—while supportive of the women in the workplace can hardly be said to be hostile or abusive to the men in the workplace based on their gender.  Nor are there sufficient allegations that, even if the poster could be viewed as hostile, it is sufficiently severe to give rise to a hostile work environment claim.  *Cf.  Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 549 (2d Cir. 2010) (finding that rational juror could infer from sexual comments that physical threats, otherwise facially neutral, were based on sex); *Alfano*, 294 F.3d at 379–80.  The Court thus independently grants Defendants' motion to dismiss Plaintiff's hostile work environment claim on this basis, as well as on the basis of Plaintiff's failure to exhaust this claim.  *See Murray-Dahnir v. Loews Corp.*, 1999 WL 639699, at \*3 (S.D.N.Y. Aug. 23, 1999) (finding similarly on a motion to dismiss that the facially neutral actions alleged by the plaintiff could not support a claim of hostile work environment, though they might support a claim of failure to promote).

### D.      Plaintiff's Remaining Claims

Plaintiff alleges several claims, primarily for his unpaid benefits.  These include claims for transportation benefits, the terms of his health insurance, the transfer of his retirement fund to a trust, and payment of his remaining unused vacation, sick, and personal days.  He also alleges numerous other injuries.[14]  *See* Dkt. No. 2 at 6.  Plaintiff has not alleged enough facts, let alone causes of action, to sustain these claims.  With respect to Plaintiff's health insurance, Plaintiff has not identified, nor has the Court independently located, any law that would seemingly apply to Plaintiff's complaints about CDNY's terms of its health insurance plan.  Plaintiff also does not sufficiently allege facts concerning the payment of his retirement funds directly to him, as opposed to a trust.  There are also insufficient facts alleged to determine whether Plaintiff is owed anything for his transportation benefits.  With respect to payment for his vacation, sick, and personal days, "[i]t is axiomatic that an employee has no inherent right to paid vacation and sick days, or payment for unused vacation and sick days, in the absence of an agreement, either express or implied."  *Crawford v. Coram Fire Dist.*, 2015 WL 10044273, at *5 (E.D.N.Y. May 4, 2015) (internal quotation marks omitted).  The Court dismisses these remaining claims without prejudice should Plaintiff choose to replead by identifying the employment contracts or other basis for payment of these benefits.

---

[14] The Court has not identified any causes of action that would apply for Plaintiff not receiving a "good reference" from CDNY absent any allegation that it was provided for in a contract. Similarly, it is unclear what Plaintiff means by he "never was paid for close to a month worth of accruals," and thus Plaintiff has not adequately alleged a claim. Dkt. No. 2 at 25.  Plaintiff has also not alleged a claim when he states that Defendants "ma[de] [him] work more than a year with an excessive caseload" absent an allegation that he worked overtime without pay, or some other basis that is cognizable under New York and federal labor laws.  *Id.* at 6.  For all these reasons, these claims are dismissed without prejudice.

**CONCLUSION**

The motion to dismiss is GRANTED IN PART and DENIED IN PART.  Plaintiff's claims against Moran are dismissed without prejudice.  Plaintiff's claims in Section IV.D are dismissed without prejudice.  The motion to dismiss is denied with respect to Plaintiff's failure-to-promote claim under Title VII.  The remaining claims are dismissed with prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 21.


SO ORDERED.

Dated: September 27, 2022
         New York, New York                     _____
                                                              LEWIS J. LIMAN
                                                       United States District Judge

35